IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

SHANE HOPKINS,

                Plaintiff,

     v.

CASSANDRA DICRISTI, et al.,

                Defendants.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 13-5490 (JBS-KMW)

**OPINION**

---

APPEARANCES:

SHANE HOPKINS, Plaintiff pro se
111265-C/684706
New Jersey State Prison
P.O. Box 861
Trenton, New Jersey 08625

GREGORY R. BUENO, ESQ.
OFFICE OF THE ATTORNEY GENERAL
25 Market Street
P.O. Box 112
Trenton, New Jersey 08625
Attorney for Defendants Cassandra DeCristi, Kenneth Nelson,
Donna Sweeney, and Crystal Raupp.

**SIMANDLE, Chief Judge:**

## I.   INTRODUCTION

This matter comes before the Court on Plaintiff Shane
Hopkins' ("Plaintiff") Motion to Amend the Complaint (Docket
Entry 70). Defendants Cassandra DeCristi,[1] Kenneth Nelson, Donna
Sweeney, and Crystal Raupp ("State Defendants") filed partial

---

[1] Improperly pled as "DiCristi."

opposition to the motion. (Docket Entry 73). This motion is being considered on the papers pursuant to Fed. R. Civ. P. 78(b). For the reasons set forth below, Plaintiff's motion shall be granted, and the second amended complaint shall be dismissed in part and shall proceed in part.

## II.  BACKGROUND

### A. Procedural History

On September 12, 2013, Plaintiff filed a complaint pursuant to 42 U.S.C. § 1983 alleging his rights under the Interstate Agreement on Detainers ("IAD") and the United States Constitution were violated by Joseph Bondiskey, the Warden/Administrator of the Atlantic County Justice Facility ("ACJF"), and the State Defendants. (Docket Entry 1). He also filed a request for an order directing the State Defendants to conform to the provisions of the IAD by informing the Commonwealth of Pennsylvania that he wanted to resolve his pending charges in that state. (Docket Entry 2). Plaintiff withdrew this request on December 23, 2013, after Defendant DeCristi assisted Plaintiff with contacting the Delaware County Prosecutor's Office in Pennsylvania. (Docket Entry 12).

Defendant DeCristi filed a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) and for summary judgment on April 16, 2014. (Docket Entry 23). On June 2, 2014, Plaintiff filed a Motion to Amend the Complaint. (Docket Entry

26). Magistrate Judge Karen M. Williams granted the motion and filed the amended complaint on July 18, 2014. (Docket Entries 35 and 36). By Order dated September 16, 2014, this Court dismissed Defendant DeCristi's motion as moot due to the filing of the amended complaint. (Docket Entry 53).

The State Defendants filed a Motion to Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on September 23, 2014.[2] (Docket Entry 58). Plaintiff filed his opposition on October 9, 2014. (Docket Entry 60). The Court granted the motion in part and gave Plaintiff leave to amend his complaint. (Docket Entry 69). Plaintiff filed the instant motion to amend the complaint on July 21, 2015. (Docket Entry 70).

**B. Factual Background**

    *1.   Allegations in the Pleadings*

Plaintiff was arrested and detained in the ACJF on January 14, 2011, pending trial on burglary charges. (Docket Entry 70-1 ¶ 15). Shortly after Plaintiff's arrival, ACJF officials ran Plaintiff's name through the National Crime Information Center database and learned there were outstanding detainers against Plaintiff in Pennsylvania, Virginia, and South Carolina. (Docket Entry 70-1 ¶¶ 16-17).

---

[2] This Court granted Defendant Bondiskey's motion to dismiss on March 31, 2015. (Docket Entry 67).

Plaintiff pled guilty to burglary on March 2, 2011. (Docket Entry 70-1 ¶ 18). As part of the plea bargain, Plaintiff requested that the court run its sentence concurrent to his anticipated Pennsylvania sentence. (Docket Entry 70-1 ¶ 18). On April 27, 2011, the trial court sentenced Plaintiff to three years to run concurrently with Plaintiff's Pennsylvania charges. (Docket Entry 70-1 ¶ 19).

Plaintiff was transferred to the Central Reception and Assignment Facility ("CRAF"), and thereafter to South Woods State Prison ("SWSP"). (Docket Entry 70-1 ¶¶ 20-23). Plaintiff received notification of outstanding detainers against him at each facility. (Docket Entry 70-1 ¶¶ 21-23). Plaintiff asked an unidentified SWSP social worker as to the meaning of the detainers, and was told that he would be extradited to one of the states upon the conclusion of his New Jersey prison term. (Docket Entry 70-1 ¶¶ 24-25).

During Plaintiff's time at SWSP, he was accepted into the Heating, Ventilation, and Air Conditioning ("HVAC") Training Program. (Docket Entry 70-1 ¶ 26). When the instructor learned of the outstanding detainers against Plaintiff, however, he removed Plaintiff from the program as the program was meant for prisoners who were expected to be released within four years. (Docket Entry 70-1 ¶ 26). Plaintiff also alleges he was denied

minimum custody classification as the result of having the unresolved detainers. (Docket Entry 70-1 ¶ 27).

On January 31, 2012, while Plaintiff was being housed at ACJF for a court appearance, Plaintiff escaped from custody. (Docket Entry 70-1 ¶¶ 28-29). He was captured shortly thereafter and transferred to New Jersey State Prison ("NJSP") on February 1, 2012. (Docket Entry 70-1 ¶ 30). Shortly after his arrival at NJSP, Plaintiff learned from an inmate paralegal that he could request resolution of his detainers under the IAD. (Docket Entry 70-1 ¶¶ 31-32). After conducting some preliminary research, Plaintiff spoke with Defendant Raupp, a social worker at NJSP, regarding his desire to resolve his Pennsylvania detainers under the IAD. (Docket Entry 70-1 ¶¶ 33-34). Defendant Raupp indicated she did not know if Plaintiff had any outstanding detainers. (Docket Entry 70-1 ¶ 35).

About a month later, Plaintiff received another notification that there were outstanding detainers against him. (Docket Entry 70-1 ¶ 36). Plaintiff spoke with Defendant Raupp again and asked to be extradited to Pennsylvania under the IAD. (Docket Entry 70-1 ¶¶ 37-38). She informed Plaintiff that NJSP did not arrange for prisoners to resolve their out-of-state charges, and he would have to contact the Pennsylvania prosecutor himself. (Docket Entry 70-1 ¶ 39). Over the next several months, Plaintiff continued to ask Defendant Raupp how

to resolve his Pennsylvania charges and objected to the prison's
failure to assist him. (Docket Entry 70-1 ¶ 47).

On November 19, 2012, Plaintiff submitted an Inmate Remedy
Form ("IRF") requesting a list of all the detainers lodged
against him as well as the prosecutors' contact information.
(Docket Entry 70-1 ¶ 48). An unknown member of NJSP's
Classification Department responded with a list of the detainers
and the contact information but no guidance as to how to
proceed. (Docket Entry 70-1 ¶ 49). Plaintiff again asked
Defendant Raupp for assistance in resolving his detainers on
November 29, 2012, and the NJSP Classification Department
responded with another list of Plaintiff's detainers with no
further information. (Docket Entry 70-1 ¶ 50). Plaintiff alleges
the Classification Department, specifically Defendant DeCristi
and John Doe employees, ignored all of his requests for
assistance. (Docket Entry 70-1 ¶¶ 51-52).

On April 17, 2013, Defendant Raupp gave Plaintiff the
contact information for the Delaware County Prosecutor's Office
and told him to write to them as "there was nothing that the
administration of the [NJSP] could do to assist [him]." (Docket
Entry 70-1 ¶ 53). Plaintiff wrote to the Pennsylvania prosecutor
but received no response. (Docket Entry 70-1 ¶ 54).

Plaintiff contacted various New Jersey officials regarding
his inability to resolve his detainers, including NJSP

6

Administrator Charles Warren and New Jersey Department of
Corrections ("DOC") Commissioner Gary Lanigan. (Docket Entry 70-
1 ¶¶ 55-59). Plaintiff also called the DOC's Office of the
Ombudsman on June 16, 2013, in an effort to resolve his
complaints. (Docket Entry 70-1 ¶ 60). The Ombudsman's office
responded via letter dated July 24, 2013, with a list of
Plaintiff's detainers and a suggestion to submit another IRF.
(Docket Entry 70-1 ¶ 61). A few days later, Defendant Sweeney
wrote to Plaintiff and indicated that Plaintiff's letter had
been forwarded to Defendant DeCristi, who would interview him
shortly in order to begin the process of resolving the
detainers. (Docket Entry 70-1 ¶ 62).

On July 28, 2013, Plaintiff wrote another letter to the
Ombudsman's Office as he still had not received any response
from anyone at NJSP regarding his desire to resolve his
detainers. (Docket Entry 70-1 ¶ 64). He filed another IRF on
July 29, 2013. (Docket Entry 70-1 ¶ 65). On August 4, 2013,
Plaintiff wrote to Defendant Sweeney complaining about the lack
of response from Defendant DeCristi. (Docket Entry 70-1 ¶ 66).
Plaintiff wrote to Defendant DeCristi directly on August 10,
2013, and requested that she forward his request for resolution
to the relevant Pennsylvania officials. (Docket Entry 70-1 ¶
67). He filed another IRF asking Defendant DeCristi to forward
his request for extradition to Pennsylvania on August 12, 2013.

7

(Docket Entry 70-1 ¶ 68). Defendant DeCristi did not respond to Plaintiff's letter or IRF; however, Defendant Sweeney wrote to Plaintiff on August 12, 2013, indicating that a member of Defendant DeCristi's staff would "be interviewing [Plaintiff] soon, to begin [his] demand under the IAD." (Docket Entry 70-1 ¶¶ 69-70).

Unsatisfied with this response, Plaintiff spoke with the Acting NJSP Administrator, Defendant Nelson,[3] on August 15, 2013, regarding the difficulties he had experienced in trying to resolve his detainers under the IAD. (Docket Entry 70-1 ¶ 71). Defendant Nelson assured Plaintiff that Defendant DeCristi would "be told to take care of it." (Docket Entry 70-1 ¶ 71). Plaintiff indicates did not receive responses to his IRFs, except in the form of verbal assurances that his concerns would be handled. (Docket Entry 70-1 ¶ 73).

Plaintiff filed the instant action on September 12, 2013 after continuing to receive no assistance from the State Defendants. (Docket Entry 1). On October 29, 2013, this Court filed the complaint and ordered the State Defendants to show cause as to why Plaintiff's motion for a temporary restraining order should not be granted. (Docket Entry 3). Shortly thereafter, Plaintiff received responses to his outstanding IRFs

---

[3] Defendant Nelson apparently replaced Defendant Warren as NJSP Administrator at an unknown point in time.

indicating that his "concerns and [IAD] demands would be addressed." (Docket Entry 70-1 ¶ 74).

Plaintiff was finally interviewed by Defendant DeCristi and a non-party co-worker on or about December 3, 2013. (Docket Entry 70-1 ¶ 82). Defendant DeCristi repeatedly denied responsibility for completing IAD requests and told Plaintiff that he had to do it himself. (Docket Entry 70-1 ¶ 83). She further stated that she had not answered any of his IRFs or letters because he was "'brought here because [he] escaped and [he was] not eligible to go to Pennsylvania.'" (Docket Entry 70-1 ¶ 85). Plaintiff informed her that under the IAD and enacting legislation, escapees were eligible to request extradition but had to restart the process if they escaped while their request was pending. (Docket Entry 70-1 ¶¶ 87-88). According to Plaintiff, "Defendant DeCristi became angry. Her tone became excessively authoritative and" Plaintiff believed he would be in trouble if he said anything further. (Docket Entry 70-1 ¶ 89). On December 4, 2013, Defendant DeCristi finally provided Plaintiff with the Notice of Untried Indictment regarding Plaintiff's Pennsylvania charges. (Docket Entry 70-1 ¶ 94).

Plaintiff was extradited to Pennsylvania on January 30, 2014, and was convicted and sentenced on April 4, 2014. (Docket Entry 70-1 ¶ 96). Plaintiff returned to New Jersey on May 7, 2014. (Docket Entry 70-1 ¶ 96). On September 5, 2014, he

completed the request for disposition of his Virginia charges.
(Docket Entry 70-1 ¶ 97). The Commonwealth of Virginia declined
to extradite Plaintiff. (Docket Entry 70-1 ¶ 98). Plaintiff
completed his request for disposition of his South Carolina
charges on January 6, 2015. (Docket Entry 70-1 ¶ 99). South
Carolina likewise declined to extradite Plaintiff and dismissed
the charges against him. (Docket Entry 70-1 ¶ 100).

   2. *Defendants' Statement of Facts*

   The State Defendants object to the second amendment of
Plaintiff's complaint on the grounds that Plaintiff has failed
to set forth a claim for violations of the Equal Protection and
Due Process Clauses. They also argue that Plaintiff's demands
for punitive damages should be dismissed, and his claim for
compensatory damages for mental and emotional distress is barred
by the Prison Litigation Reform Act, Pub. L. No. 104-134, §§
801-810, 110 Stat. 1321-66 to 1321-77 (April 26, 1996) ("PLRA").
They do not object to the amendment of Plaintiff's claim under
the IAD at this point in time. (Docket Entry 73 at 4).

## III. STANDARD OF REVIEW

   Rule 15(a) of the Federal Rules of Civil Procedure permits
a party to amend a pleading once as a matter of course twenty-
one (21) days after serving the pleading or twenty-one (21) days
"after a responsive pleading or service of a motion under Rule
12(b), (e), or (f), whichever is earlier." Fed. R. Civ. Pro.

15(a)(1)(A)-(B). "In all other cases, a party may amend its
pleading only with the opposing party's written consent or the
court's leave. The court should freely give leave when justice
so requires." Fed. R. Civ. Pro. 15(a)(2). Leave to amend a
pleading may be denied where the court finds: (1) undue delay;
(2) undue prejudice to the non-moving party; (3) bad faith or
dilatory motive; or (4) futility of amendment. *Shane v. Fauver*,
213 F.3d 113, 115 (3d Cir. 2000).

## IV.  ANALYSIS

In its June 30, 2015 opinion and order, the Court dismissed
Plaintiff's Due Process, Equal Protection, access to the courts,
speedy trial, Eighth Amendment, and punitive damages claims
under Federal Rule of Civil Procedure 12(b)(6). (Docket Entries
68 and 69). Plaintiff's second amended complaint reasserts his
Due Process, Equal Protection, and punitive damages claims.[4] He
has also apparently abandoned his request for declaratory and
injunctive relief. (Docket Entry 70-1 at 20-22).

Plaintiff asserts Defendants' arguments are more
appropriate in a motion to dismiss than in opposition to a
motion to amend. (Docket Entry 74 at 1-2). As Defendants mainly
object to the amendment of the complaint on futility grounds,
however, the Court must engage in an analysis similar to one

---

[4] Defendant Lanigan was also dismissed from the action entirely.
Plaintiff does not reassert any claims against him.

that would occur in a motion to dismiss. *See Shane*, 213 F.3d at 115 ("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted. In assessing 'futility,' the District Court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." (internal citation omitted)). As Defendants object only to certain portions of the proposed second amended complaint, the Court will limit its review to those contested claims.

The Court concludes amendment would not be entirely futile, and therefore Plaintiff's motion to amend certain claims shall be granted. Certain other claims shall be dismissed as amendment of those claims would be futile.

**A. Due Process**

In his first amended complaint, Plaintiff argued the Defendants' failure to follow the federal IAD violated the Due Process Clause of the Fourteenth Amendment. In his papers opposing Defendants' motion to dismiss, he changed his argument to assert their actions violated a state created liberty interest. The Court declined to address that argument as it was improperly raised, but granted Plaintiff leave to amend his complaint in that aspect. He has done so in his second amended complaint.

Plaintiff asserts the New Jersey Statute and Administrative Code provision that set forth the procedures by which a

correctional facility must handle out-of-state detainers lodged against a prisoner create a liberty interest protected by the Due Process Clause. *See* N.J. STAT. ANN. § 2A:159A-1 *et seq.*; N.J. ADMIN. CODE ¶ 10A:10-4.4. He therefore argues the State Defendants' failure to follow the state law and administrative code, as opposed to the federal IAD, constitutes a violation of his Due Process rights.

"A protected liberty interest may arise from only one of two sources: the Due Process Clause or the laws of a state." *Asquith v. Dep't of Corr.*, 186 F.3d 407, 409 (3d Cir. 1999)(citing *Hewitt v. Helms,* 459 U.S. 460, 466 (1983)).[5] In order to determine whether a state law or regulation has created a liberty interest, the Court must apply the standard set forth by the Supreme Court in *Sandin v. Conner*, 515 U.S. 472, 481-82, (1995).

In *Sandin*, the prisoner asserted prison officials had denied him due process when they prohibited him from presenting witnesses at his disciplinary hearing. *Id.* at 475-76. The District Court granted defendants' summary judgment motion; however, the Court of Appeals for the Ninth Circuit reversed the

---

[5] The Court has already held that a violation of the IAD does not implicate Plaintiff's Due Process rights as set forth in the Due Process Clause itself. *See Hopkins v. DiCristi*, No. 13-5490, slip. op at 17-18 (D.N.J. June 30, 2015) (citing *Cooney v. Fulcomer*, 886 F.2d 41, 46 n.8 (3d Cir. 1989), *cert. denied*, 485 U.S. 979 (1988)).

judgment. Relying on a line of Supreme Court cases beginning with *Hewitt v. Helms*, 459 U.S. 460 (1983), the Ninth Circuit concluded that the relevant prison regulation "provide[d] explicit standards that fetter[ed] official discretion" and required a specific result. *Conner v. Sakai*, 15 F.3d 1463, 1466 (9th Cir. 1993), *rev'd*, *Sandin*, 515 U.S. 472. The *Hewitt* Court had "asked whether the State had gone beyond issuing mere procedural guidelines and had used 'language of an unmistakably mandatory character' such that the incursion on liberty would not occur 'absent specified substantive predicates.'" *Sandin*, 515 U.S. at 480 (quoting *Hewitt*, 459 U.S. at 471–472). "Finding such mandatory directives in the regulations before it, the [*Hewitt*] Court decided that the State had created a protected liberty interest." *Ibid*. Consequentially, the Ninth Circuit concluded from the language of the regulation before it "that the committee may not impose segregation if it does not find substantial evidence of misconduct. It viewed this as a state-created liberty interest, and therefore held that [the prisoner] was entitled to call witnesses . . . ." *Id*. at 477.

The *Sandin* Court, however, expressed dissatisfaction with *Hewitt* and its progeny for their focus on the mandatory language. According to the Court, cases following *Hewitt* "ceased to examine the 'nature' of the interest with respect to interests allegedly created by the State[,]" and instead

14

"wrestled with the language of intricate, often rather routine prison guidelines to determine whether mandatory language and substantive predicates created an enforceable expectation that the State would produce a particular outcome with respect to the prisoner's conditions of confinement." *Id.* at 480-81. In reversing the Ninth Circuit's decision, the *Sandin* Court explicitly rejected the *Hewitt* methodology. *See id.* at 483 ("[W]e believe that the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause.").

Having abandoned *Hewitt*'s focus on the mandatory language of prison regulations, the Court held that a prisoner is "deprived of a state-created liberty interest only if the deprivation 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Asquith v. Dep't of Corr.*, 186 F.3d 407, 412 (3d Cir. 1999) (quoting *Sandin*, 515 U.S. at 484); *see also Proctor v. Burke*, No. 15-2260, 2015 WL 6913579, at *4 (3d Cir. Nov. 10, 2015) ("Where the plaintiff is a prisoner, a state-created liberty interest can arise only when a prison's action imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (internal citation and

quotation marks omitted)); *Fantone v. Latini*, 780 F.3d 184, 188 (3d Cir. 2015), *as amended* (Mar. 24, 2015).

Plaintiff's arguments that he was deprived of a state created liberty interest rely on the mandatory language of the regulation:

> It is mandatory that I should have received notification of my right to dispose of all out of state detainers lodged against me. It is mandatory that any request to dispose of my detainer must have been honored. The New Jersey Department of Corrections promulgated N.J.A.C. 10A.4 for the explicit purpose of insuring my rights under the Interstate Agreement on Detainers Act using mandatory language and substantive predicates. Once these mandatory regulations were inacted [sic] they created a state mandated liberty interest that the Defendants had no discretion to ignore.

(Docket Entry 74 at 6 (citing *Hewitt v. Helms*, 459 U.S. 460, 470-71 (1983)). This is the precise argument the Supreme Court sought to foreclose in *Sandin*. *See* 515 U.S. 472, 481-82 (1995) (noting "shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation . . . encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges").

The Court also rejected Plaintiff's assertion that mandatory regulations, such as § 10A:10-4.4, were intended to create rights rather than simply set forth procedures.

> Such a conclusion may be entirely sensible in the ordinary task of construing a statute defining rights and remedies available to the general public. It is a

good deal less sensible in the case of a prison regulation primarily designed to guide correctional officials in the administration of a prison. Not only are such regulations *not designed to confer rights on inmates*, but the result of the negative implication jurisprudence is not to require the prison officials to follow the negative implication drawn from the regulation, but is instead to attach procedural protections that may be of quite a different nature.

*Ibid.* (emphasis added). The Court further noted that holding mandatory language in a regulation always created a liberty interest would impermissibly interfere with the orderly administration of prisons:

Prison administrators need be concerned with the safety of the staff and inmate population. Ensuring that welfare often leads prison administrators to curb the discretion of staff on the front line who daily encounter prisoners hostile to the authoritarian structure of the prison environment. *Such guidelines are not set forth solely to benefit the prisoner.* They also aspire to . . . confine the authority of prison personnel in order to avoid widely different treatment of similar incidents. The approach embraced by *Hewitt* discourages this desirable development: States may avoid creation of "liberty" interests by having scarcely any regulations, or by conferring standardless discretion on correctional personnel.

*Id.* at 482 (emphasis added).

As it is firmly established that "mandatory language" in a prison regulation is not enough to establish a state created liberty interest, and Plaintiff does not allege he was subjected to an atypical and significant hardship in relation to the

ordinary incidents of prison life,[6] he has not set forth a claim of a violation of a state created liberty interest. This claim must therefore be dismissed.

Plaintiff shall not be given leave to amend this claim as further amendment would be futile. Although New Jersey has codified the IAD, *see* N.J. STAT. ANN. § 2A:159A-1 *et seq.*, the IAD "is an interstate compact approved by Congress and is thus a federal law subject to federal rather than state construction." *Cuyler v. Adams*, 449 U.S. 433, 438 (1981); *see also* U.S. CONT. art. I, § 10, cl. 3. Under federal law, the provisions of the IAD that the State Defendants allegedly violated do not implicate Plaintiff's Due Process rights. *Cooney v. Fulcomer*, 886 F.2d 41, 46 n.8 (3d Cir. 1989), *cert. denied*, 485 U.S. 979 (1988). New Jersey's codification of the IAD does not confer rights upon Plaintiff that are not provided for in the federal IAD. Section 2A:159A-1 does not create a liberty interest protected the by Fourteenth Amendment.

---

[6] Plaintiff explicitly rejects the idea that he must allege an atypical and significant hardship in order for his claim to survive. (Docket Entry 74 at 5-6). Even if his complaint was construed as alleging such a hardship, however, Plaintiff has no liberty interest in a particular custody classification or work assignment. *See Chavarriaga v. N.J. Dep't of Corr.*, No. 14-2044, 2015 WL 7171306, at *7 (3d Cir. Nov. 16, 2015) (no state created liberty interest in particular custody level); *Presbury v. Wenerowicz*, 472 F. App'x 100, 101 (3d Cir. 2012) (no state created liberty interest in prison job).

18

In addition, the DOC Commissioner clearly stated in
proposing N.J. ADMINISTRATIVE CODE § 10A:10 for readoption in 2003
that "the rules proposed for readoption with amendments and new
rules comply with and *do not exceed any Federal statutes,
requirements or standards*." 35 N.J. Reg. 1639(a) (Apr. 21, 2003)
(emphasis added), *adopted* 35 N.J. Reg. 3559(a) (Aug. 8, 2003);
*see also* 47 N.J. Reg. 1285(a) (June 15, 2015).[7] Thus even if
Plaintiff were to allege that the State Defendants' actions
imposed an atypical and significant hardship, the DOC has made
clear that § 10A:10 goes no further than the federal IAD. This
Court therefore concludes N.J. ADMINISTRATIVE CODE § 10A:10-4.4 does
not create a liberty interest entitled to protection under the
Due Process Clause.

Plaintiff has not set forth a claim of a violation of a
state created liberty interest under *Sandin v. Conner*, 515 U.S.
472, 481-82 (1995). In light of the Court's finding that there
is no state created liberty interest, this claim must be
dismissed without leave to amend.

**B. Equal Protection**

Plaintiff asserts in his second amended complaint that
Defendant DeCristi's failure to timely apprise him of the
detainers against him and relay his demands for resolution to

---

[7] The New Jersey Legislature has delegated rulemaking authority
to the Commissioner. N.J. STAT. ANN. § 30:1B-6.

the proper Pennsylvania authorities violated his Fourteenth Amendment right to Equal Protection on a "class-of-one" theory. *See Engquist v. Or. Dep't of Agric.,* 553 U.S. 591, 601 (2008). To make out such a claim, Plaintiff must allege: (1) Defendant DeCristi treated him differently from others similarly situated, (2) she did so intentionally, and (3) there was no rational basis for the difference in treatment. *Hill v. Borough of Kutztown,* 455 F.3d 225, 239 (3d Cir. 2006). Defendants argue that permitting this claim to be amended is futile as Plaintiff has failed to sufficiently allege that Defendant DeCristi treated him differently from other similarly situated inmates. (Docket Entry 73 at 9-11).

Plaintiff's second amended complaint states in relevant part:

> Upon my information and belief it is reasonable to believe that other inmates incarcerated within the state of New Jersey with convictions for escape have received notification of their rights to have detainers lodged against them brought to a final disposition and have been extradited to out of state jurisdictions for trial on outstanding criminal charges.

(Docket Entry 70-1 ¶ 93). The Court construes this paragraph as alleging the "similarly situated persons" are those New Jersey inmates with escape convictions and out-of-state detainers. Plaintiff has not sufficiently pled that he was treated any differently than these people as there is nothing in the complaint to suggest these people actually exist.

20

Plaintiff's second amended complaint offers nothing more than speculation that these similarly situated persons exist and are able to resolve their out-of-state detainers without a problem, a fact he candidly admits. (Docket Entry 74 at 6-7). "Because [Plaintiff] has failed to identify any other similarly situated inmates . . . who were treated differently, his equal protection claim lacks merit." *Brown v. Beard*, 445 F. App'x 453, 456 (3d Cir. 2011). In the absence of any supporting facts whatsoever, the claim must be dismissed. *See Mann v. Brenner*, 375 F. App'x 232, 238-39 (3d Cir. 2010) (finding that district court properly dismissed "class of one" equal protection claim where plaintiff's allegations amounted "to nothing more than 'a formulaic recitation of the elements' of a constitutional discrimination claim.").

Plaintiff argues that his claim should not be dismissed until he has had the opportunity to conduct discovery and potentially ascertain facts that support this claim. (Docket Entry 74 at 7). If this question were before the Court on Defendants' motion for summary judgment, Plaintiff's request might be a reason to delay the Court's decision. *See* Fed. R. Civ. Pro. 56(d)(2). As this is Plaintiff's motion to amend his complaint, however, the proposed complaint as submitted, and with all reasonable inferences construed in favor of Plaintiff, must be capable of surviving a motion to dismiss under Rule

21

12(b)(6). Permitting a claim to go forward on nothing more than speculation and hope that some supporting fact might be revealed in discovery would render Rules 8(a)(2) and 12(b)(6) completely meaningless. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)). Similarly, conclusory phrases or labels do not suffice where no factual grounds are supplied.

"At the motion to dismiss stage, [Plaintiff] must allege facts sufficient to make plausible the existence of such similarly situated parties." *Perano v. Twp. Of Tilden*, 423 F. App'x 234, 238 (3d Cir. 2011). He has not done so.[8] In the event Plaintiff finds factual support for his claim during discovery, he may file another motion for leave to amend under Rule 15(a)(2). As the complaint stands now, however, this claim must be dismissed.

## C. Compensatory Damages

The State Defendants assert Plaintiff's claim for compensatory damages for mental and emotional distress must be

---

[8] It is likewise not a reasonable inference from the pleadings that such a favored class of inmates exists, given that the second amended complaint seems to suggest that Defendants had no idea how to process IAD requests in general. It is contradictory to presume that there is a distinct group of persons who had no trouble resolving their detainers.

dismissed under the PLRA as he has not alleged a physical injury. (Docket Entry 73 at 11). Plaintiff asserts that the section requiring a physical injury is limited to conditions of confinement claims, and as a detainer is not a condition of his confinement, the bar does not apply to him. (Docket Entry 74 at 3-4).

To the extent that Plaintiff's claims compensatory damages for mental and emotional distress, he is barred by § 803 of the PLRA, which amends 42 U.S.C. § 1997e. Section 1997e states in relevant part:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).

42 U.S.C. § 1997e(e). "The plain language of § 1997e(e) makes no distinction between the various claims encompassed within the phrase 'federal civil action' to which the section applies." *Allah v. Al-Hafeez*, 226 F.3d 247, 250 (3d Cir. 2000); *see also Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir. 2002) ("Section 1997e(e) applies to all federal civil actions including claims alleging constitutional violations"); *Doe v. Delie*, 257 F.3d 309, 314 n.3 (3d Cir. 2001); *compare with* 42 U.S.C. 1997e(a) ("No action shall be brought *with respect to prison conditions* under section 1983 of this title, or any other Federal law, by a

prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." (emphasis added)).

Plaintiff asserts he as "suffered several deprivations . . . including an abundance of stress and anxiety" as the result of Defendants' alleged violations of the IAD.[9] (Docket Entry 74 at 3). Section 1997e(e) is clear: "in order to bring a claim for mental or emotional injury suffered while in custody, a prisoner must allege physical injury, an allegation that [Plaintiff] undisputedly does not make." *Allah*, 226 F.3d at 250. Therefore, in the present circumstances, Plaintiff may not recover compensatory damages for any mental or emotional distress.[10]

Reading the amended complaint liberally, however, Plaintiff's claim for compensatory damages does not appear to be limited to mental and emotional damages. (Docket Entry 70-1 at 21-22). To the extent Plaintiff seeks compensation for costs actually incurred as a result of Defendants' alleged violations, damages for actual costs incurred, if any, are not barred by § 1997e(e) and shall be permitted to proceed.

---

[9] As Plaintiff's Due Process and Equal Protection claims are being dismissed, only his request for compensatory damages due to alleged violations of the IAD remains. (Docket Entry 70-1 at 21). The limitation under § 1997e(e) does apply to those claims as well, however. *Thompson*, 284 F.3d at 416; *Allah*, 226 F.3d at 250.
[10] Section 1997e(e) does not bar any requests for nominal or punitive damages. *See Doe*, 257 F.3d at 314 n.3.

## C. Punitive Damages

Defendants DeCristi and Raupp assert Plaintiff's claim for punitive damages against them must be dismissed as he has failed to sufficiently allege they "acted with 'reckless or callous indifference [to his] federally protected rights.'"[11] (Docket Entry 73 at 13 (quoting *Brennan v. Norton*, 350 F.3d 399, 428 (3d Cir. 2003)).

Under § 1983, a defendant whose conduct demonstrates a reckless or callous indifference toward others' rights may be liable for punitive damages. *See Smith v. Wade,* 461 U.S. 30, 56 (1983) (stating that a jury may award punitive damages when a "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others"); *Savarese v. Agriss,* 883 F.2d 1194, 1204 (3d Cir. 1989) (holding that a defendant's conduct must be at minimum reckless or callous to impose punitive damages under § 1983).

Giving Plaintiff the benefit of all reasonable inferences, as the Court must at this point in time, he has sufficiently pled that Defendant DeCristi demonstrated a callous indifference towards his rights under the IAD. Callous is defined as

---

[11] As Plaintiff's Due Process and Equal Protection claims are being dismissed, only his request for punitive damages for alleged violations of the IAD by Defendants DeCristi and Raupp remain. (Docket Entry 70-1 at 22).

"insensitive; indifferent; unsympathetic." *Callous,* DICTIONARY.COM,
http://dictionary.reference.com/browse/callous (last visited
Nov. 20, 2015). Plaintiff alleges Defendant DeCristi admitted
she intentionally refused to respond to his multiple
institutional remedy forms over the course of several months.
(Docket Entry 70-1 ¶ 85). He further alleges that she became
angry at Plaintiff when he attempted to explain his position.
(Docket Entry 70-1 ¶¶ 88-89). Together, these allegations are
enough to plausibly infer that Defendant DeCristi was
insensitive, indifferent, or unsympathetic towards Plaintiff's
rights.

Plaintiff's allegations against Defendant Raupp, however,
do not plausibly suggest recklessness or callousness as they
stand in stark contrast to his allegations against Defendant
DeCristi. He concedes Defendant Raupp provided him with the
address of the Delaware County Prosecutor's office so that he
could contact them and attempt to resolve his detainers, albeit
after several requests. (Docket Entry 70-1 ¶¶ 47, 53). The
complaint also indicates that remedy forms submitted to
Defendant Raupp were answered in a reasonable amount of time,
(Docket Entry 70-1 ¶¶ 48-50), unlike those directed towards
Defendant DeCristi and the Classification Department. As a
whole, these allegations do not suggest Defendant Raupp was
indifferent or unsympathetic, especially considering Plaintiff

does not allege she was ultimately responsible for providing him
with the proper forms or forwarding his requests. (Docket Entry
70-1 ¶¶ 41-46).

Regardless of whether Defendant Raupp complied with the
IAD, Plaintiff's allegations against her are insufficient to
state a claim for punitive damages. Plaintiff's punitive damages
claim against Defendant DeCristi shall be permitted to proceed
at this time.

**V. CONCLUSION**

For the reasons stated above, Plaintiff's motion to amend
the complaint is granted and shall proceed in part. Defendants
shall be ordered to respond. An appropriate order shall follow.


__December 1, 2015__                    __s/ Jerome B. Simandle__
Date                                    JEROME B. SIMANDLE
                                        Chief U.S. District Judge


27